## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Leo Maruani,

        Plaintiff,

v.                                    **Memorandum of Law and Order**

        Civil File No. 06-176 (MJD/AJB)

AER Services, Inc.,

        Defendant.

_____

Gregg M. Corwin, and Katherine L. Miller, Gregg M. Corwin and Associates Law Office, PC, Counsel for Plaintiff.

Shanna Sadeh, Thomas M. Sipkins, and Jennifer H. Wood, Maslon Edelman Borman & Brand, Counsel for Defendant.

_____

## I.    INTRODUCTION

This case is before the Court on Defendant's motion to dismiss Counts One through Four and Seven for lack of subject matter jurisdiction.  [Doc. No. 10.] The Complaint alleges that AER violated the Minnesota Human Rights Act ("MHRA"), the Minnesota Whistleblower Act, the Workers Compensation Act, and Minn. Stat. §§ 181.933 and 181.961.  The Complaint also alleges wrongful termination in violation of public policy and promissory estoppel.  Oral arguments were held on May 17, 2006.

1

## II.    FACTUAL BACKGROUND

Plaintiff Leo Maruani was employed by Defendant AER as a *shochet*, or kosher butcher, from 1993 until September 8, 2005 when he was terminated. (Maruani Aff. ¶ 2.)  AER is a for-profit business that provides slaughtering services for companies that sell kosher meat products, such as ConAgra Foods and Best Kosher Foods.  (Ben-David Aff. ¶ 2; Miller Aff. Ex. 1.)

### A.    *Shochet* History/Description

Under Jewish dietary laws and customs known as *Kashruth*, meat is not considered "kosher," or fit for consumption by observant Jews, unless the animal has been slaughtered according to religious rituals by a specially trained and licensed individual called a *shochet*.  (Ralbag Aff. ¶¶ 3-11; Small Aff. ¶¶ 2-11.) According to *Kashruth*, the *shochet* must have a license issued by an Orthodox Jewish rabbi and must be someone who is "God-fearing in the public's eye." (Ralbag Aff. ¶ 11; Small Aff. ¶ 12.)  This has been interpreted to mean that the *shochet* must live a visibly pious life in the eyes of the Orthodox Jewish religious community.  (Id.)  Orthodox Jews believe that consumption of non-kosher foods defiles the holy and eternal soul.  Therefore, members of the Orthodox Jewish community must be able to trust that the *shochet* has performed his responsibilities properly and that the meat is indeed kosher.

AER's customers separately retain the services of Orthodox Jewish rabbis to

provide kosher certification for their products.  (Ben-David Aff. ¶ 2.)  The rabbis

are responsible for ensuring that the customer's product meets all requirements of

*Kashruth*.  (Ralbag Aff. ¶ 2; Small Aff. ¶ 3.)  Therefore, the rabbis must guarantee

that every *shochet* employed by AER is "God-fearing in the public's eye."  (Ralbag

Aff. ¶ 11; Small Aff. ¶ 12.)

### B.    Maruani's *Shochet* Certification

Maruani holds a *kabbalah* certificate issued by Rabbi Jacov G. Safranovitz in

Los Angeles, California.  (Maruani Aff. ¶ 2.)  Maruani's wife was not born Jewish,

but converted to Judaism in 1999 in Israel and was again converted by an

Orthodox rabbi in December 2000.  (Id.)  Shlomoh Ben-David, the president of

AER, was aware that Maruani's wife was a converted Jew and viewed the

documentation regarding the second conversion.  (Id.)

### C.    Maruani's Work History

Maruani worked for AER at a Rapid City, South Dakota plant from 1995 to

2002.  (Maruani Aff. ¶ 4.)  During this time, he did not live near an Orthodox

Jewish community.  (Id.)

According to Maruani, the Rapid City plant burned down in 2002 and Ben-

David asked him to transfer to Minnesota to work in Buffalo Lake.  (Id. at ¶ 5.)

Maruani states that Ben-David promised to pay him quarterly bonuses of $3,000 to

$3,500 if he transferred to Minnesota.  Maruani and his family relocated to

Minnetonka, Minnesota.  At the end of 2002, Maruani became the manager of

AER's operations in Buffalo Lake and South St. Paul.  (Maruani Aff. ¶ 5.)

In early 2003, Rabbi Aryeh Ralbag was appointed by ConAgra Foods to be

the supervising and certifying rabbinical authority for ConAgra's "Hebrew

National" brand of kosher foods.  (Ben-David Aff. ¶ 7; Ralbag Aff. ¶ 13.)  As a

result of this appointment, Ralbag became the rabbi in charge of the South St.

Paul facility.  (Id.)

According to AER, after a review of Maruani's qualifications, Ralbag

determined that Maruani was not "God-fearing in the public's eye" because he did

not live within walking distance of an Orthodox Jewish synagogue.  (Ben-David

Aff. ¶ 8; Ralbag Aff. ¶ 14.)  A necessary part of Orthodox Jewish observance is

attending synagogue on *shabbat* and observers are not allowed to ride in a car or

motorized vehicle to get to the services.  Therefore, unless Maruani lived within

walking distance of an Orthodox Jewish synagogue, he could not walk to

synagogue on *shabbat* and in Ralbag's view was not living a visibly pious life.

(Ralbag Aff. ¶ 14.)  Ralbag also believed Maruani was unqualified to be a *shochet*

because, in his opinion, (1) Maruani's wife had not been properly converted to

Judaism, making their marriage invalid; (2) Maruani's *kabbalah* certificate was

granted by an unacceptable source; (3) Maruani's wife did not cover her hair in

public and did not use the *mikvah*, a ritual bath; and (4) Maruani did not keep a

4

full beard and wear a dark suit and white shirt, as required under Orthodox interpretation of Jewish law.  (Ralbag Aff. ¶¶ 15-18.)

Upon learning of Ralbag's noted deficiencies with Maruani's qualifications, Ben-David requested additional time to make the necessary changes.  AER claims that Ralbag allowed Maruani until the spring of 2004 to make the changes and that Ben-David and Maruani had frequent conversations about these changes over the next year.  (Ben-David Aff. ¶ 9.)

According to Maruani, however, he did not even meet Ralbag until January 2004 and Ralbag expressed that all of Maruani's documentation appeared to be in order at their meeting.  (Maruani Aff. ¶ 7.)  Furthermore, Maruani claims that Ben-David did not discuss his need to move to an Orthodox Jewish community until January 2005.  (Maruani Aff. ¶ 20.)

In March 2004, Ralbag informed Maruani that he could not continue to manage the South St. Paul productions.   According to Maruani, Ralbag informed him that "they" wanted Maruani out of the South St. Paul plant, but that Ralbag himself "had no problem with" Maruani.  (Maruani Aff. ¶ 9.)  After being removed from the South St. Paul plant, Maruani continued to manage the Buffalo Lake plant which was overseen by Rabbi Small, whom Maruani had worked with for many years.  (Maruani Aff. ¶ 10.)

Sometime in the summer of 2004, Rabbi Small also determined that

Maruani needed to change residences in order to be living a visibly pious life. (Small Aff. ¶ 15.)  Rabbi Small, at Ben-David's request, allowed Maruani additional time to move, but continued to insist on a near-weekly basis that he was not an acceptable *shochet*.  (Small Aff. ¶ 14.)

Ben-David and Moshe Fayzakov, the vice-president of AER, directed Maruani to move to the St. Louis Park neighborhood by the end of October 2005 or risk termination.  (Maruani Aff. ¶ 20.)  Maruani maintains that at least two other AER employees, Akivah Chernoshek and Moshe Git, were not asked to move near an Orthodox Jewish community.  In September 2005, Maruani informed Ben-David and Fayzakov that he had found an apartment in St. Louis Park but wanted written assurances that AER would not make additional requests if he moved.  (Maruani Aff. ¶ 21.)  Maruani was terminated on September 8, 2005. (Ben-David Aff. ¶ 16.)

### C.     Maruani's Allegations

#### 1.     Immigration/Money Laundering

According to Maruani, Moshe Fayzakov, the vice-president of AER, was engaged in a scheme to recruit illegal aliens into the United States on false education visas and asked Maruani to launder money through his bank accounts in order to pay these workers.  (Maruani Aff. ¶ 11.)  Maruani maintains that his refusal to participate in this illegal scheme is the reason he was no longer allowed

6

to work in the South St. Paul facility.  Maruani believes that Benjamin Benzev, Maruani's replacement in South St. Paul and another employee, Daniel Khalkadarov, participated in Fayzakov's scheme.

Maruani further alleges that Khalkadarov repeatedly threatened Maruani and his family and that Khalkadarov was involved in an incident at the Buffalo Lake facility leading to Khalkadarov's temporary suspension.  After Khalkadarov was suspended, the remaining workers were required to sit idle which escalated into a verbal confrontation between workers.  Maruani, concerned about possible violence, called 911.  Maruani maintains that Fayzakov threatened that the person who called 911 would be fired.  (Maruani Aff. ¶ 17.)  Maruani then flew to Chicago to inform Ben-David of the threats and retaliation regarding Fayzakov's activities.

## 2.   **Workers Compensation Claims**

On May 16, 2005, Maruani's finger was crushed in a packing plant door. (Maruani Aff. ¶ 19.)  Maruani reported the incident to AER's head administrative assistant and requested workers compensation despite having observed AER threaten employees with termination for reporting on-the-job injuries.  (Maruani Aff. ¶ 19.)  AER did not file a claim with its insurer and Maruani continued to work because he feared being terminated.  AER later filed a claim, but since it was after Maruani was terminated, the claim was denied.  (Id.)

### III.    PROCEDURAL HISTORY

Maruani commenced this lawsuit in Minnesota state court and AER removed the matter to this Court based on diversity jurisdiction.  Count One of the Complaint alleges that AER discriminated against Maruani on the basis of his religion in violation of the MHRA, Minn. Stat. § 363A.08.  Counts Two and Three allege violations of Minn. Stat. § 181.932 ("Minnesota Whistleblower Act") involving Maruani's suspicions of illegal immigration and money laundering. Count Four alleges a common law whistleblower claim regarding the alleged immigration and money laundering practices.  Count Five asserts violations of Minn. Stat. § 181.933 for not providing a written reason for termination.  Count Six asserts a violation of Minn. Stat. § 181.961 for not providing Maruani with a copy of his personnel file.  Count Seven alleges that AER violated Minn. Stat. § 176.82 ("Minnesota Workers Compensation Act") by not submitting a timely workers compensation claim.  Count Eight invokes the doctrine of promissory estoppel regarding bonuses which  Maruani alleges AER promised him.

The parties signed a stipulation dated January 26, 2006 that AER need not answer Counts Five, Six, or Eight of the Complaint until after the Court's resolution of the instant motion.  Additionally, all discovery has been postponed until disposition of this motion.  This motion does not concern counts Five, Six, or Eight of the Complaint.

**IV.   ANALYSIS**

**A.   Motion to Dismiss Pursuant to Rule 12(b)(1)**

A party may move to dismiss for lack of subject matter jurisdiction at any time during the course of an action.  Fed. R. Civ. P. 12(b)(1).  Once jurisdiction is challenged, the burden of establishing the court's subject matter jurisdiction rests on the party asserting jurisdiction.  Thomson v. Gaskill, 315 U.S. 442, 446 (1942).

"A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'"  Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993) (quotations omitted).  In a factual attack the court considers matters outside of the pleadings and the non-moving party does not have the benefit of 12(b)(6) safeguards.  Id.

**B.   Whether the First Amendment Bars Judicial Review of Maruani's Claims**

The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ."  U.S. Const. Amend. I.  Therefore, courts "exercise no jurisdiction" over any matter that "concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them."  Watson v. Jones, 80 U.S. 679, 733 (1871).  Otherwise stated, courts generally may not inquire into a religious organization's activities on matters of

9

religious doctrine or authority and courts lack subject matter jurisdiction over most disputes stemming from a religious organization's actions.  See Farley v. Wis. Evangelical Lutheran Synod, 821 F. Supp. 1286, 1288 (D. Minn. 1993). Furthermore, the First Amendment forbids civil courts from deciding whether religious doctrine or ecclesiastical law supports a particular decision made by church authorities.  Scharon v. St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 363 (8th Cir. 1991).

To be valid under the Establishment Clause, a governmental regulation must (1) have a secular purpose; (2) neither advance nor inhibit religion in its primary effect; and (3) not foster excessive governmental entanglement with religion.  Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971).  The Lemon test is also employed to determine when regulations can be constitutionally applied by the judiciary.  Scharon, 929 F.2d at 362.  Only the third prong of the test is at issue in this case.  Whether governmental regulation creates excessive governmental entanglement depends on a weighing of the following factors: (1) the character and purpose of the institution involved; (2) the nature of the intrusion into religious administration; and (3) the resulting relationship between the government and the religious authority.  Id. at 614-15.  Finally, in order to protect against the use of the First Amendment as a pretextual shield to cover up otherwise prohibited employment decisions, courts must consider each situation

10

on a case-by-case basis, "looking in each case to see whether the plaintiff's . . .

claim can be adjudicated without entangling the court in matters of religion."

Scharon, 929 F.2d at 363 n.3.

AER asserts that the Court lacks subject matter jurisdiction over Counts One

through Four and Seven of the Complaint because these counts pertain to their

decision to terminate Maurani based upon religious doctrine.  According to AER,

any examination of its decision would require the Court to opine on the religious

standards set for *shochtim* in violation of the Establishment Clause.

### 1.    The Character and Purpose of the Institution Involved

Generally, courts set out to determine whether the position and employer

are "pervasively sectarian."  See EEOC v. Miss. College, 626 F.2d 477, 487 (5th Cir.

1980).  As is the case here, the lines between sectarian and non-sectarian are not

always readily apparent.  In some situations the plaintiff may be employed by a

religious organization, but have a job function that has little to do with religion.

In other cases, the employer may be a primarily non-religious entity but the

position at issue may be a largely spiritual position.

Courts analyze two factors to ascertain whether the character and purpose

of the institution involved is inherently religious.  First, courts determine whether

the employer displays "substantial religious character" and should be considered a

religious institution in its role as employer of the plaintiff.  Scharon, 929 F.2d at

363.  Thus, a hospital displays substantial religious character when the board of directors consists of four church representatives and its articles of association may only be amended with approval of the Episcopal Diocese of Missouri of the Protestant Episcopal Church in the United States of America and the local Presbytery of the Presbyterian Church.  Id.  But, a ranch operated by a church is sectarian when it employs no ministers, chooses staff without regard to religious beliefs or affiliations, and does not conduct religious classes or services. Volunteers of America-Minn. Bar None Boys Ranch v. NLRB, 752 F.2d 345, 348 (8th Cir. 1985).

Second, courts inquire into whether the position at issue is secular or religious in nature.  Scharon, 929 F.2d at 363.  A hospital chaplain whose duties include both secular and non-secular activities was considered a "spiritual employee who also perform[s] secular duties" when the job description states that seventy percent of the job entailed the provision of "a religious ministry of pastoral care, pastoral counseling . . . and liturgical services."  Id.  However, the position of teacher at a church-affiliated school was non-secular in nature when the teacher's duties did not include "teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship."  Rohland v. St. Cloud Christian School, No. A04-821, 2004 WL 2940889, at *3 (Minn. Ct. App. Dec. 21, 2004) (unpublished) (quoting Rayburn v.

12

<u>Gen. Conference of Seventh-Day Adventists</u>, 772 F.2d 1164, 1169 (4th Cir. 1985))
(emphasis added).

AER is a secular employer under any standard.  It is a for profit business,
not owned or operated by any church, which essentially serves as a staffing
agency for *shochtim*.  Furthermore, by its own admission, AER cannot opine on
the qualifications of its *shochtim.*  Accordingly, AER, as a secular employer is not
entitled to First Amendment protections for religious institutions.

Maurani's position of *shochtim*, on the other hand, does have a substantial
religious character.  The slaughtering of animals in the Jewish faith is a ritual.
The requirements of a *shochet* are determined by rabbis, not by individual
employers.  Maruani was required to be certified by an Orthodox Jewish rabbi and
no non-Orthodox Jew can hold the position of *shochet*.  Thus the Court concludes
that although AER itself may be a secular organization, Maruani's position had
substantial religious character.  Because the position of *shochet* has substantial
religious character, the Court continues to weigh the other factors of the <u>Lemon</u>
test to determine whether exercising jurisdiction over these claims is proper.

**2.      <u>The Nature of the Intrusion into Religious Administration and the Resulting Relationship Between the Religious Authority                 and the Court</u>**

The Court must next examine the nature of the potential intrusion into
religious administration presented by the Court assuming jurisdiction over this

dispute and the resulting relationship between the religious authority and the Court. For the reasons that follow, the Court determines that its involvement in Count One would impermissibly entangle the Court in matters of religious doctrine. However, at the present stage of the litigation the Court is unable to predict that the evidence offered at trial or in future motions regarding Counts Two, Three, Four, and Seven will involve the Court in an impermissible inquiry into religious doctrine.

Courts have often examined these prongs by posing the ultimate question to be answered and opining as to whether that inquiry would require excessive entanglement. For example, jurisdiction has been found proper in situations involving a religious employer who offered a non-religious reason for termination since the court did not risk becoming excessively bound up in matters of religious concern. Drevlow v. Lutheran Church, Missouri Synod, 991 F.2d 468, 471 (8th Cir. 1993). In Scharon, the court determined that the ultimate issue would be whether the church-affiliated hospital's proffered religious reason for termination was a pretext for sex discrimination. Scharon, 929 F.2d at 363. Similarly, a recent Third Circuit case noted that "the decisive question for the District Court or the jury will be whether [the plaintiff] was demoted due to her gender, and this question will remain independent of religious matters." Petruska v. Gannon Univ., 448 F.3d 615, 632 (3d Cir. 2006).

14

Many courts have determined that examining the ultimate issue of pretext would risk excessive entanglement in violation of the First Amendment. "[T]he resolution of such charges . . . will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators. It is not only the conclusions that may be reached . . . which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry." Scharon, 929 F.2d at 363 (citation omitted); see also Geraci v. Eckankar, 526 N.W.2d 391, 399-400 (Minn. Ct. App. 1995) (holding that court lacked jurisdiction based on First Amendment and the Minnesota Constitution when plaintiff was terminated because she had been excommunicated from her church where church membership was a condition of employment because the court could not evaluate pretext "without questioning the reasons for the excommunication and the veracity of those reasons.").

For the reasons that follow, the Court determines that Count One is inherently secular and must be dismissed. However, at this point in the litigation, the Court finds that jurisdiction over Counts Two, Three, Four, and Seven will not excessively entangle the Court in religious affairs and AER's motion to dismiss them is denied.

### a.   Count One

Maurani alleges in Count One that he was subject to illegal discrimination based upon his religion in violation of the MHRA. He contends that AER and the

15

rabbis placed religious requirements upon him that they did not impose on other *shochtim*. For example, Maurani asserts that two other *shochtim* were not required to relocate to an Orthodox Jewish community, as he was. By treating him differently than other *shochtim*, Maurani asserts that he was discriminated against on the basis of his religion.

The Court is certain at this stage in the litigation that an analysis of Count One would necessarily involve inquiry into the good faith of the position asserted by the rabbis. An examination of the gradations in the rules of *Kashruth* or severity with which the rabbis enforced those rules is precisely the type of religious-based claim the Court is forbidden from entertaining. This is akin to evaluating "the conformity of the members of a church to the standards or morals required of them," which has long been forbidden. Watson v. Jones, 80 U.S. 679, 733 (1871).

It is impossible to isolate the religious discrimination claim from the rabbis' decision making process. Examining the potential scope of discovery alone elucidates the Court's concern. Maurani would be unable to succeed on this claim without subjecting the rabbis to discovery regarding their certifications of other AER employees and the rationale behind those certifications - an inquiry not within the purview of the Court. Thus, the Court finds that it lacks subject matter jurisdiction over Count One.

### b.   Counts Two, Three, Four, and Seven

Upon a weighing of the <u>Lemon</u> factors, the Court is not convinced at this point in the litigation, that an inquiry into religious doctrine is necessary as to Counts Two, Three, Four, and Seven.

AER points to two cases which dismissed all claims that required an ultimate determination that the proffered religious-based reason was pretextual. The Court finds that each of these cases is distinguishable from the present circumstances.

First, both <u>Scharon</u> and <u>Geraci</u> were dismissed by their respective trial courts on a motion for summary judgment.  At that point in the cases, discovery had been completed and no direct evidence of impropriety was involved. Therefore, a showing of pretext was required under the <u>McDonnell-Douglas</u> analysis and the courts' rationale turned on the fact that they could not fathom any way to analyze the decisive issue without examining the veracity of the church's proffered reason for termination.  <u>Scharon</u>, 929 F.2d at 363; <u>Geraci</u>, 526 N.W.2d 401.

In this case, because discovery has not yet been conducted, it is possible that Maurani may have direct evidence of an illegal termination by AER on Counts Two, Three, Four, and Seven.  The Court's task then "is not to determine whether the religious reason is legitimately based on religious doctrine, the court's

17

task is to determine whether the religious reason is the real reason for the employer's actions." <u>Rohland v. St. Cloud Christian School</u>, No. A04-821, 2004 WL 2940889, at *6 (Minn. Ct. App. Dec. 21, 2004) (unpublished).

Furthermore, both <u>Scharon</u> and <u>Geraci</u> involved a decision to terminate made by a religious authority. In those cases, any challenge to the reason for termination went directly to the truthfulness of the religious figures' determinations. Here, however, the decision to terminate Maurani was made by AER, a non-religious entity. Under these circumstances the Court can envision a situation wherein Maurani could contend that the rabbis' determination did not in fact motivate AER to take the adverse employment action without challenging the validity, existence or plausibility of the religious doctrine itself.

Accordingly, Maurani is entitled to an opportunity to prove his secular allegations at trial. If further proceedings reveal that this matter cannot be resolved without interpreting religious procedures or beliefs, the Court must then re-examine its subject matter jurisdiction. <u>See</u> <u>Drevlow</u>, 991 F.2d at 472.

AER also argues that the motion to dismiss should be granted because Maruani does not challenge the rabbis' opinions in this case. By acquiescing to the rabbis' determinations that he was not qualified to be a *shochet*, AER asserts that Maruani has undermined his prima facie case of discrimination and retaliation. AER's argument is premature. This issue is not properly before the

18

Court since Maurani is not required to establish a prima facie case on a motion to dismiss for lack of subject matter jurisdiction.  Thus, Counts Two, Three, Four, and Seven need not be dismissed at this stage in the litigation.

### C. <u>Whether the Freedom of Conscience Clause Prevents the Court From Exercising Jurisdiction</u>

Because the Court has already determined that it lacks subject matter jurisdiction over Count One, the following analysis addresses only the remaining counts subject to AER's motion to dismiss: Counts Two, Three, Four, and Seven.

Article I, Section 16 of the Minnesota Constitution ("Freedom of Conscience Clause") provides that:

> [t]he right of every man to worship God according to the dictates of his own conscience shall never be infringed . . . nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state . . .

Whereas the First Amendment limits the government from prohibiting the free exercise of religion, the Freedom of Conscience Clause precludes any infringement upon or even interference with religious freedom.  <u>Geraci</u>, 526 N.W.2d at 398-99. Accordingly, while the freedom to exercise religious beliefs is an absolute constitutional right, an individual's right to practice his or her religion, in certain circumstances, may be subject to reasonable governmental regulations if the government has an overriding compelling interest.  <u>State by McClure v. Sports &</u>

Health Club, 370 N.W.2d 844, 851 (Minn. 1985) (citation omitted).

In determining whether government action violated the Freedom of Conscience Clause, courts consider whether: (1) the objector's belief is sincerely held; (2) the state regulation burdens the exercise of religious beliefs; (3) the state interest in the regulation is compelling; and (4) the state regulation uses the least restrictive means.  Hill-Murray Fedn. of Teachers v. Hill-Murray High Sch., 487 N.W.2d 857, 865 (Minn. 1992); Basich v. Bd. of Pensions, Evangelical Lutheran Church in Am., 540 N.W.2d 82, 87 (Minn. Ct. App. 1996).

In this case, an analysis of the first prong is not determinative and will not be set forth here.  The second prong, whether the regulation burdens the exercise of religious beliefs, weighs in favor of denying AER's motion to dismiss.

 AER argues that the Court's exercise of jurisdiction over these claims threatens "to compel conformance with conflicting religious beliefs."  (Memo. in Supp. of Mot. To Dismiss 22.)  The Court does not agree.  Analogous to the situation in Rohland where the Minnesota Court of Appeals determined that the court could analyze pretext without violating the Freedom of Conscience Clause, Maurani's claims related to Counts Two, Three, Four, and Seven will not necessarily involve any analysis into religious doctrine.  Furthermore, because a searching inquiry into the rationale behind the rabbis' decision will not be allowed, the Court is not convinced that the religious beliefs of the rabbis will be

affected in any way by the continuance of this litigation.

Moreover, the Court finds that the two Minnesota cases cited by AER are distinguishable.  In <u>Geraci v. Eckankar</u>, 526 N.W.2d 391, 399-400 (Minn. Ct. App. 1995), the plaintiff did not contest that she had been excommunicated and that church membership was a condition of her employment.  The <u>Geraci</u> court determined that its analysis as to the propriety of church membership as a job requirement would violate the Freedom of Conscience clause.  The second case, <u>Doe v. Lutheran High School of Minneapolis</u>, 702 N.W.2d 322, 329 (Minn. Ct. App. 2005), held that although the government had a compelling interest in prohibiting discrimination, the high school had sincerely held religious beliefs that homosexuality is a sin and that further litigation would require analysis of those beliefs and impermissibly burden the free exercise of religion.  <u>Id.</u>  However, in both of these cases, the employer that made the termination decision was the religious institution itself.  <u>Geraci</u>, 526 N.W.2d at 395; <u>Lutheran High School</u>, 702 N.W.2d at 324-25.  In this case, the rabbis who applied the rules of *Kashruth* did not make the decision to terminate Maurani.  The employer, AER, by its own admission, is not professing any sincerely held religious beliefs.  AER is a secular, for-profit organization and the Court's involvement in this case does not excessively burden the exercise of AER's religious beliefs.

Clearly, the state regulations at issue, namely providing protection for

21

workers compensation filers and whistleblowers is compelling.  AER does not

contend that this is not a legitimate state interest.  Accordingly, as was the case in

Rohland v. St. Cloud Christian School, 2004 WL 2940889, at *6, the Court

acknowledges that even a "limited judicial review of a discharge decision places

some burden on [defendant] and raises the possibility that the court will inquire

into religious doctrine."  However, the mere possibility of a burden on AER's

religious beliefs does not outweigh the compelling state interests in protecting

workers compensation claimants and whistleblowers under this particular set of

facts.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendant AER's Motion to Dismiss [Docket No. 10] is **GRANTED IN**

     **PART** and **DENIED IN PART**;

     a.  The Motion is **GRANTED** as to Count One of the Complaint

          and Count One is dismissed with prejudice;

     B.  The Motion is **DENIED** as to Counts Two, Three, Four, and

          Seven; and

     C.  Counts Five, Six, and Eight are unaffected by this Order.


Dated: September 18, 2006                        s / Michael J. Davis
                                                              Judge Michael J. Davis
                                                              United States District Court


22